******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE AVIANA J.*
## (AC 47807)

Elgo, Suarez and Westbrook, Js.

*Syllabus*

The respondent mother appealed from the judgment of the trial court terminating her parental rights with respect to her minor child. The mother claimed, inter alia, that the court improperly determined that she had failed to achieve the requisite degree of personal rehabilitation required by statute (§ 17a-112 (j) (3) (B) (i)). *Held*:

The trial court's unchallenged factual findings, including findings regarding the respondent mother's ongoing struggles with substance abuse and her lack of housing and income, supported its determination, by clear and convincing evidence, that the mother failed to achieve such degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (i), as would encourage the belief that, within a reasonable time, she could assume a responsible caretaking position in the child's life.

The trial court's determination that the termination of the respondent mother's parental rights was in the child's best interest was not clearly erroneous and was supported by sufficient evidence.

Argued January 13—officially released February 24, 2025**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Bridgeport, Juvenile Matters, and tried to the court, *McLaughlin, J.*; judgment terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed*.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** February 24, 2025, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*David B. Rozwaski*, assigned counsel, for the appellant (respondent mother).

*Joshua P. Britt*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee (petitioner).

*Opinion*

SUAREZ, J. The respondent mother, Elizabeth T., appeals from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights with respect to her minor child, Aviana J.[1] On appeal, the respondent claims that the court improperly determined (1) that she failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B) (i), and (2) that the termination of her parental rights was in Aviana's best interest.[2] We affirm the judgment of the court.

The following facts, which the court found by clear and convincing evidence or are otherwise undisputed, and procedural history are relevant to the resolution of this appeal. The respondent came to the attention of the Department of Children and Families (department) shortly after Aviana was born in June, 2021. "On June 18, 2021, the department received a call on its Careline[3]

---

[1] Initially, the petitioner named the respondent's boyfriend as the father of Aviana. However, a subsequent paternity test conclusively established that he was not the father. Thereafter, the court issued orders of nonpaternity with respect to him, and the petitioner withdrew the action as to him. The petitioner also named John Doe as the putative father of Aviana. The court terminated the parental rights of John Doe as to Aviana, and he is not participating in this appeal. All references in this opinion to the respondent are to Elizabeth T. only.

[2] The attorney for the minor child filed a statement adopting the brief filed by the petitioner.

[3] Careline "is a department telephone service that mandatory reporters and others may call to report suspected child abuse or neglect." (Internal quotation marks omitted.) *In re S. G.*, 229 Conn. App. 834, 837 n.3, 328 A.3d 737 (2024).

from the Bridgeport Hospital, where [Aviana] was born, reporting that the [respondent] and [Aviana] had tested positive for cocaine. [Aviana] experienced withdrawal symptoms including hypertonia and jitters. [Aviana] was fed by way of a [nasogastric] tube. The [respondent] notified hospital staff that she had a history of heroin use and last had used heroin on June 15 or 16 [2021, mere] days before giving birth to [Aviana]. The [respondent] denied using cocaine or marijuana. [That same day], the department met with the [respondent]. She reported that she never received any prenatal care because she did not realize she was pregnant until approximately a month to a month and half before [Aviana] was born. She continued using heroin after learning she was pregnant. The [respondent] told the department that she did not have supplies for [Aviana]." (Footnote added.)

"On June 24, 2021, the [petitioner] filed an ex parte order of temporary custody (OTC) and neglect petition on behalf of [Aviana]. On June 24, 2021, the court granted the ex parte OTC. The court sustained the OTC on July 2, 2021, vesting temporary custody of [Aviana] in the [petitioner]. At the hearing sustaining the OTC, the court ordered preliminary specific steps for the [respondent]. On August 5, 2021, the court adjudicated [Aviana] neglected and committed [her] care and custody to the [petitioner]. The court also ordered final specific steps[4] for the [respondent]. . . . On January

---

[4] With respect to the respondent, the court ordered her, inter alia, to "[t]ake part in counseling and make progress toward the identified treatment goals," namely, "to remain substance abuse free [and] to address your mental health in order to parent the child," to "[s]ubmit to substance abuse evaluation and follow the recommendations about treatment, including inpatient treatment if necessary, aftercare and relapse prevention," to "[n]ot use illegal drugs or abuse alcohol or medicine," to "[c]ooperate with service providers recommended for parenting/individual/family counseling, in-home support services and/or substance abuse assessment/treatment," and to "[g]et and/ or maintain adequate housing and a legal income."

17, 2023, the [petitioner] filed [the] termination of parental rights petition . . . . On February 6, 2024, the court approved a permanency plan of termination of parental rights and adoption." (Footnote added; footnote omitted.)

On May 2, 2024, the court, *McLaughlin, J.*, held a hearing on the petitioner's petition for the termination of parental rights. The respondent appeared and was represented by appointed counsel. On May 16, 2024, the court issued a memorandum of decision terminating the respondent's parental rights. In its memorandum of decision, the court found by clear and convincing evidence that the respondent had an ongoing substance abuse problem for which she failed to consistently engage in treatment. The court found that, "[o]n June 18, 2021, the department referred the [respondent] to [Center for Human Services (CHS)]—Recovery Network Program for the methadone maintenance program and Project Courage for substance use treatment. On June 22, 2021, the [respondent] completed an intake with Project Courage. She failed to engage in treatment. The department referred the [respondent] to individual therapy with Gary Vertula. She failed to engage."

The court further found that, "[i]n July, 2021, the department referred the [respondent] to CHS for substance use treatment. She engaged with CHS and entered the methadone maintenance program, the intensive outpatient program [IOP] and attended individual counseling. At the commencement of her treatment in July, 2021, the [respondent] tested positive for cocaine, fentanyl, and marijuana. In August, 2021, she tested positive for opiates, benzodiazepines, cocaine, and fentanyl. In August, 2021, CHS recommended the [respondent] attend a higher level of care through inpatient treatment with New Prospects. The [respondent] failed to follow through with treatment at New Prospects. In August, 2021, the [respondent] stopped engaging with CHS.

"From August, 2021, until April, 2022, the [respondent] failed to engage in any substance use treatment.[5] On April 20, 2022, the [respondent] was arrested on charges of larceny in the sixth degree, conspiracy to commit larceny, interfering with an officer and violation of probation. The criminal court placed the [respondent] on conditions of release which included cooperating with the Pathway Program with [Jay Brothers Unified Resource Center (Jay Brothers)]—a treatment program for women involved in the criminal justice system with substance abuse issues. The Office of Adult Probation supervised the [respondent] on her conditions of release. In April, 2022, the [respondent] entered a detoxification program. At her intake, the [respondent] tested positive for cocaine, methadone, fentanyl, and ecstasy.

"From April, 2022, through July, 2022, the [respondent] participated in inpatient treatment through the Families in Recovery Program. The [respondent] successfully completed inpatient treatment on July 27, 2022, and moved in with her mother. The [respondent] was offered methadone maintenance, mental health services and medication management services through the Liberations Program. She completed her intake for the methadone clinic on July 28, [2022], and the intake for mental health services on July 29, [2022]. The [respondent] attended her first medication management session on August 3, 2022, and continued to participate sporadically thereafter. She never followed up for mental health services. . . .

"Although, in the summer and fall of 2022, the [respondent] was participating in substance use treatment, she began using drugs on a regular basis. On

---

[5] "The [respondent] reported that she reengaged with CHS in January, 2022. CHS denied that [the respondent] was engaged in its programming at that time."

September 12, 2022, the [respondent] tested positive for cocaine and fentanyl. On September 19, 2022, the [respondent] tested positive for cocaine, opiates, and fentanyl. On September 22, 2022, the [respondent] tested positive for cocaine and opiates. Due to the [respondent's] consistent use of illicit substances, her provider recommended that she participate in a higher level of care through inpatient substance abuse treatment. . . .

"From October, 2022, through November 22, 2022, the [respondent] engaged in substance use treatment with the Stonington Institute. The Stonington [Institute] program included hospitalization and intensive outpatient services. On November 22, 2022, the [respondent] successfully completed her treatment and moved to a sober house, the Tina Klem House.

"On November 23, 2022, the [respondent] completed an intake with CHS for methadone maintenance and mental health services. On November 29, 2022, the [respondent] started an IOP with Regional Counseling Services (RCS). She inconsistently attended the group sessions. Her toxicology screenings in November and December, 2022, were negative for all substances.

"In March, 2023, the [respondent] successfully completed outpatient treatment with RCS but continued, as recommended, with group sessions. In April, 2023, the [respondent] successfully left the Tina Klem House. Although the [respondent] did not consistently attend her IOP group sessions, in June, 2023, she successfully completed her ongoing outpatient treatment with RCS. At that time, she was testing negative for all substances.

"Approximately a month after successfully completing her outpatient treatment, the [respondent] started testing positive for illicit substances again. On July 20, 2023, the [respondent] tested positive for cocaine. The Office of Adult Probation referred the [respondent] to

the APT Foundation for treatment. The [respondent] failed to engage.

"On August 28, 2023, the [respondent] tested positive for cocaine and fentanyl. The Office of Adult Probation referred the [respondent] for a substance abuse evaluation with Southwest Community Health Center (SCHC). The [respondent] failed to attend the evaluation. In August, 2023, the department referred the [respondent] to an [advanced practice registered nurse (APRN)] with CHS for medication management. The [respondent] never followed up with the APRN.

"The [respondent] had been attending sporadically the methadone maintenance program with CHS during the summer months of 2023. In August, 2023, CHS discharged the [respondent] from the methadone maintenance program due to her failure to regularly attend. The [respondent] told the department that she was engaging with Kinsella Treatment Center for methadone maintenance. When the department reached out to Kinsella [Treatment Center] to confirm the [respondent's] engagement, [it] notified the department that the [respondent] was not one of its clients. . . .

"In October, 2023, the [respondent] tested positive for cocaine. In October, 2023, the [respondent] claimed that she was referred to [Midwestern Connecticut Council of Alcoholism, Inc. (MCCA)], not SCHC, for a substance abuse evaluation. At this point, the Office of Adult Probation told the [respondent] that she was in technical violation of her probation because of her continued use of illicit substances and her failure to engage in treatment. On November 9, 2023, the [respondent] tested positive for cocaine and fentanyl. The Office of Adult Probation referred the [respondent] to the APT Foundation for treatment. The [respondent] failed to engage.

"On November 15, 2023, the [respondent] completed an intake with MCCA. At intake, she tested positive for cocaine, fentanyl, opiates, and marijuana. MCCA recommended that the [respondent] engage in IOP. The [respondent] failed to return to MCCA until November 29, 2023. When the [respondent] reengaged, MCCA administrated a drug screen, and the [respondent] tested positive for cocaine, fentanyl, opiates, and marijuana. MCCA discharged the [respondent] on December 18, 2023, and recommended that she engage in a detoxification program. On December 19, 2023, the [respondent's] adult probation officer notified her that she was filing a formal violation of probation (VOP) due to the [respondent's] continued drug use and failure to engage in treatment. On January 3, 2024, the VOP issued. . . .

"In March, 2024, the [respondent] submitted to a drug screen with Jay Brothers at the request of the department. She tested positive for cocaine and fentanyl. . . . On May 1, 2024, the day before the [termination of parental rights] trial, the [respondent] submitted to an 'instant' drug screen with Jay Brothers. The screen was positive for cocaine, fentanyl, and opiates." (Footnote in original; footnotes omitted.)

After setting forth the foregoing subordinate factual findings, the court found by clear and convincing evidence that (1) the department had made reasonable efforts to locate the respondent and to reunify the respondent with Aviana and that the respondent was unable or unwilling to benefit from the reunification efforts, (2) the petitioner established that a statutory ground for termination of the respondent's parental rights exists, namely, that the respondent had failed to achieve a sufficient level of personal rehabilitation as required by § 17a-112 (j) (3) (B) (i), and (3) termination of the respondent's parental rights was in the best interest of Aviana. Accordingly, the court terminated the respondent's parental rights. This appeal followed.

The general legal principles applicable to proceedings to terminate parental rights are well settled. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence." (Internal quotation marks omitted.) *In re Shane M.*, 148 Conn. App. 308, 316, 84 A.3d 1265 (2014), aff'd, 318 Conn. 569, 122 A.3d 1247 (2015). Section 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing . . . may grant a petition [to terminate parental rights] if it finds by clear and convincing evidence that . . . (3) . . . (B) the child . . . has been found . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and [the parent] has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." "If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Shane M.*, supra, 316.

I

On appeal, the respondent first claims that the court improperly determined that she failed to achieve a sufficient degree of personal rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i). Specifically, the respondent argues that the bond between her and Aviana

"undermines confidence in the trial court's conclusions" and justifies affording the respondent additional time to rehabilitate. We are not persuaded.

It is well established that a "trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsible position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue. . . . [The] completion or noncompletion [of the specific steps], however, does not guarantee any outcome. . . .

"During the adjudicatory phase of a termination proceeding, a court generally is limited to considering only evidence that occurred before the date of the filing of the petition or the latest amendment to the petition, often referred to as the adjudicatory date. . . . Nevertheless, it may rely on events occurring after the [adjudicatory] date . . . [in] considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citation omitted; internal

quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 488–89, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024). "[T]he fact that [a parent] may love [a] child does not in itself show rehabilitation, and motivation to parent is not enough; ability is required." (Internal quotation marks omitted.) *In re Lil'Patrick T.*, 216 Conn. App. 240, 254, 284 A.3d 999, cert. denied, 345 Conn. 962, 285 A.3d 387 (2022).

"A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Thus, [i]t is not the function of this court to sit as the [fact finder] when we review the sufficiency of the evidence . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Citation omitted; footnote omitted; internal

quotation marks omitted.) *In re Niya B.*, supra, 223 Conn. App. 489–90.

In the present case, the respondent has not challenged the court's subordinate factual findings as clearly erroneous. Instead, she points to the bond between herself and her daughter, arguing that it "undermines confidence in the trial court's conclusions and decision." Because the respondent has not challenged any of the court's factual findings in support of its determination that she failed to achieve a sufficient degree of personal rehabilitation, we limit our review to whether the court reasonably could have concluded, upon the subordinate factual findings it made and the reasonable inferences drawn therefrom, that the respondent failed to rehabilitate and to the impact of the bond between the respondent and Aviana on such a conclusion. See *In re S. G.*, 229 Conn. App. 834, 853, 328 A.3d 737 (2024).

In concluding that the respondent failed to rehabilitate pursuant to § 17a-112 (j) (3) (B) (i), the court found by clear and convincing evidence that, "[a]t the time of the adjudication [of neglect], the issues for the [respondent] were substance use and mental health. The court ordered final specific steps for the [respondent] at the adjudication. . . . From August, 2021, until the filing of the petition in January, 2023, the [respondent] failed to comply with her final steps in that she failed to consistently engage in substance abuse and mental health treatment, she continued using illicit substances, and she failed to gain employment or housing.

"Taking into consideration the time after the filing of the [termination of parental rights] petition, the [respondent] still had not gained sobriety. She was not engaged in substance use and mental health treatment. She failed to visit [Aviana] consistently.[6] She failed to

---

[6] "Visiting [Aviana] as often as possible was also part of the [respondent's] steps. [Sophie] Hale, [a department social worker assigned to the family's case] credibly testified that the [respondent] missed several visits or arrived late for visits in 2024."

obtain employment. Throughout the summer and fall of 2023, the [respondent] routinely tested positive for illicit substances, including, but not limited to, cocaine and fentanyl. Her drug use continued . . . just prior to trial testing positive for cocaine and fentanyl in March, 2024, and positive for cocaine, fentanyl, and opiates on May 1 [2024]. . . . The [respondent] failed to engage in any substance use or mental health services in 2024.

"At trial, the court observed the [respondent] to be very thin and fidgety. At times, the [respondent] appeared to fall asleep. . . . The [respondent] testified in earnest that she loved her daughter. She also explained to the court that addiction was hard. She was candid about the safety plan the department instituted for her visitations with [Aviana]. Pursuant to that plan, the [respondent] testified that she washed her hands and face before seeing [Aviana]. The [respondent] said that the department had her wash her hands and face to ensure that there was no drug residue on her that could impact [Aviana]. The [respondent] testified that she would not harm [Aviana]. The court believed that the [respondent] would never intentionally harm [Aviana]. However, the [respondent's] continued drug use demonstrated to the court that the [respondent] could inadvertently physically harm [Aviana] and that the [respondent] did not understand the impact her continued drug use had on [Aviana].

"The [respondent] argued that the court should not consider the drug results from May 1 [2024] that were positive for cocaine, fentanyl, and opiates because the results had not been verified by a lab. [Anika] Alcala, [the counselor at Jay Brothers] who supervised the test, testified that, in her experience with the instant test, it was highly likely that the lab would confirm the positive results. The court credited [Alcala's] testimony. Considering [Alcala's] testimony and the [respondent's] other positive drug screens, the court finds it more likely than

not that the instant test results were accurate, and the [respondent] used illicit substances just prior to trial. It was clear to the court from the credible evidence that at the time of the trial the [respondent] was an active illicit drug abuser.

"[Jessica] Biren Caverly [a licensed clinical psychologist who performed two court-ordered evaluations of the respondent] testified that, in October, 2023, [after her initial evaluation] it was her recommendation that the [petitioner] provide the [respondent] with additional time to gain sobriety before moving forward with the [termination of parental rights] petition. It was undisputed that, by May, 2024, the [respondent] had not gained sobriety. [Biren Caverly] testified that, based on the [respondent's] continued drug use and failure to engage in treatment, she supported the [termination of parental rights] petition.

"The court notes that the [respondent] also failed to obtain employment or housing. At [Aviana's] birth, the [respondent] lived a transient lifestyle. When the [respondent] left the sober house in April, 2023, she moved in with her mother. Living with her mother was not a long-term solution for the [respondent's] housing. However, the [respondent] had no plans for housing. Further, the [respondent] knew she needed to obtain employment to support herself and [Aviana]. The [respondent] had three years to find some employment. She found none.

"The [respondent] has had three years to rehabilitate. She has failed to do so. The [respondent's] active drug use, complete disengagement in treatment, and failure to obtain housing or employment leads the court to conclude that she will not play (let alone resume) a useful role in [Aviana's] life in the foreseeable future. [Aviana] needs permanency. She deserves a stable, nurturing home in which to develop. The [respondent] cannot provide such a home." (Footnote in original.)

On the basis of the foregoing, the court found that "[t]he evidence established clearly and convincingly that the [respondent] has not rehabilitated and will not rehabilitate in the foreseeable future. To allow the [respondent] any additional time to attempt to rehabilitate when she has shown no ability to do so would be pointless and to the detriment of [Aviana]."

In sum, the court found by clear and convincing evidence that, over the past three years, the respondent's ongoing struggles with substance abuse and a lack of housing and income have not improved to the point whereby the respondent has gained the ability to care for Aviana's needs. Moreover, the court found that rehabilitation was unlikely to occur within a reasonable time and that Aviana's need for permanency, stability, and a caretaker outweighed the remote possibility of the respondent achieving rehabilitation in the future. On the basis of these findings, it was reasonable for the court to determine that the respondent failed to rehabilitate. See *In re S. G.*, supra, 229 Conn. App. 855–57 (respondent's persistent drug use and failure to engage in treatment were bases for failure to rehabilitate, particularly when children's need for permanency was considered); *In re Lil'Patrick T.*, supra, 216 Conn. App. 257–58 (respondent's failure to achieve stable housing and his delay in participating in treatment programs were bases for failure to rehabilitate); *In re Carissa K.*, 55 Conn. App. 768, 779, 740 A.2d 896 (1999) (respondent's substance abuse and lack of housing and employment were bases for failure to rehabilitate). The respondent's bond with Aviana, albeit deep and sincere, does not alter this conclusion, as "[t]he fact that [a parent] may love [a] child does not in itself show rehabilitation . . . ." (Internal quotation marks omitted.) *In re Lil'Patrick T.*, supra, 254.

Accordingly, we conclude that the court's factual findings are sufficient to support its determination that

the respondent failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, she could assume a responsible care-taking position in Aviana's life.[7]

## II

Next, the respondent claims that the court erred in determining that the termination of her parental rights was in Aviana's best interest. Again, the respondent does not challenge any subordinate finding made by the court in support of its best interest determination. Instead, the respondent argues that "[t]he evidence clearly demonstrated that the respondent . . . expresses love and affection for [Aviana], is concerned for [Aviana's] health and well-being, and while [Aviana] is not able to live with her, the respondent . . . engages enough with her daughter with love and affection so that her daughter recognizes her as her mother." More-over, the respondent asserts that she "has been nurtur-ing and giving to her daughter to the best of her abilities and circumstances." We are not persuaded that this evidence undermines the court's conclusion that termi-nation of the respondent's parental rights is in Aviana's best interest.

We begin by setting forth the following relevant legal principles. "Our standard of review in a challenge to a trial court's best interest determination in a proceeding to terminate parental rights is well established. [A]n appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous. . . . We do not examine the record to determine whether

---

[7] We note that, during oral argument before this court, the respondent's counsel conceded: "Admittedly, there is not a strong argument to be made with respect to the failure to rehabilitate other than [that the respondent] was attempting to engage in services but . . . to quote [the respondent] . . . 'addiction is hard.' " This assessment of the strength of the respondent's argument is consistent with our analysis and conclusion.

the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . . In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . In the dispositional phase . . . the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in . . . § 17a-112 [(k)].[8] . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites

[8] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the [department] has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

that need to be proven before termination can be ordered. . . . Indeed . . . [t]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . [A] trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound. . . .

"Our appellate courts have recognized that long-term stability is critical to a child's future health and development . . . . In addition to considering the seven factors listed in § 17a-112 (k), [t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . Furthermore, in the dispositional stage, it is appropriate to consider the importance of permanency in children's lives. . . . Additionally, although [a] respondent may love her children and share a bond with them, *the existence of a bond between a parent and a child, while relevant, is not dispositive of a best interest determination.* . . . Our courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." (Citations omitted; emphasis in original; footnote added; footnote omitted; internal quotation marks omitted.) *In re S. G.*, supra, 229 Conn. App. 861–63.

In the present case, the respondent argues that the court's best interest finding is clearly erroneous because a strong bond exists between her and Aviana. Our case law, however, treats the existence of a bond between parent and child, even when deep and sincere, as relevant to, but not dispositive of, a court's best interest determination. See id., 863–65 (respondent

mother's bond with children was not dispositive in light of her ongoing substance abuse); *In re Autumn O.*, 218 Conn. App. 424, 444–45, 292 A.3d 66 (respondent mother's bond with children was not dispositive in light of her repeated cohabitation with individuals who created violent home environment), cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023). "Consequently, so long as there is sufficient evidence to support the court's reliance on other factors, its best interest determination is entitled to deference." *In re S. G.*, supra, 229 Conn. App. 864.

In making its best interest determination, the court took into consideration "all credible evidence and arguments of counsel," and it found by clear and convincing evidence that it was in Aviana's best interest to terminate the parental rights of the respondent. Specifically, the court considered that "[Aviana] is almost three years old, born [in June, 2021], and has been in the care of the [petitioner nearly] since birth. [Aviana] needs permanency and stability in her life to successfully develop. . . .

"The [respondent] made nominal attempts to alter her lifestyle until July, 2023, after that time the [respondent] made no attempts. . . . She never parented [Aviana] beyond her three hours of weekly visitation. . . . Although the [respondent] continues to be addicted to illicit substances, she made every effort to visit with [Aviana] until 2024. As the trial date approached, the [respondent] became less consistent with her visits; however, the undisputed evidence was that the [respondent] and [Aviana] have a bond. The [respondent] never gained sobriety or stability for the department to consider allowing the [respondent] to parent [Aviana] full-time. [Aviana] has never lived with the [respondent]. She has known only one home; the home with her foster mother.

"The overwhelming evidence established that the [respondent] has not made real efforts to adjust her circumstances, conduct or conditions to make it in [Aviana's] best interest to be reunited or returned to the [respondent's] care." Although the court observed that "[t]he [respondent's] love for [Aviana] was evident at the trial," it ultimately determined that the termination of the respondent's parental rights was necessary to provide Aviana with a "loving, nurturing, and stable home," which "love alone does not create" and the respondent cannot provide due to her ongoing substance abuse, inability to meaningfully engage in services, and lack of stable housing and employment.

In light of the court's foregoing factual findings, we conclude that the court's finding, by clear and convincing evidence, that the termination of the respondent's parental rights was in the best interest of Aviana, even given the existence of a bond between the respondent and Aviana, is not clearly erroneous and, moreover, is factually supported and legally sound. We therefore will not substitute our judgment for that of the court.

The judgment is affirmed.

In this opinion the other judges concurred.